UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

HOWARD JACKSON,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        No. 3:16-CV-604
                                   )
MAINE POINTE, LLC,                 )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court to address two motions for summary judgment. The defendant, Maine Pointe, LLC ("Maine Pointe"), filed a motion for summary judgment as to all counts of the Amended Complaint on October 9, 2017, [Doc. 37]. Maine Pointe also submitted a statement of material facts, [Doc. 38], a memorandum in support, [Doc. 39], and several affidavits from Maine Pointe employees in support of its motion for summary judgment, [Docs. 40, 41, 42, 43, and 44]. The plaintiff, Howard Jackson ("Mr. Jackson"), responded to Maine Pointe's statement of material facts, [Doc. 51], and motion, [Doc. 50], to which Maine Pointe replied, [Doc. 52]. Also before the Court is Mr. Jackson's motion for summary judgment, filed on October 13, 2017, [Doc. 45], as well as the accompanying statement of material facts, [Doc. 47], and memorandum in support, [Doc. 46]. Maine Pointe responded to the statement of material facts, [Doc. 49] as well as the motion, [Doc. 48], to which Jackson replied, [Doc. 53]. The matters are ripe for review.

## I.  FACTUAL BACKGROUND

Maine Pointe is a Massachusetts corporation specializing in operations consulting. [Doc.

39 at 2].  Mr. Jackson was employed with Maine Pointe pursuant to an employment offer letter

dated September 29, 2015, [Doc. 47-1].  This letter, in pertinent part, reads as follows:

> I am pleased to extend to you the opportunity to join Maine Pointe, LLC (the
> "Company") to become Vice President, Food and Beverage (Food and Beverage
> Industry Partner).  …  I look forward to your acceptance of this opportunity.
> Subject to your agreement and signature, you will be engaged on an at-will basis
> upon the following additional terms and conditions.  Services will commence as of
> Thursday, October 15th, 2015.  [redacted]  You will be paid an annual base income
> of $215,000.00 USD.  You will be eligible to earn sales commission on collected
> engagement revenue (not analysis, nor reimbursed T&E revenue), based on the
> schedule in Attachment A.  All commissions are paid monthly as project revenue
> is collected on or before the end of each month.  Management reserves the right to
> make changes to the sales commission plan as is deemed necessary by the business.

[*Id.*].  The letter was signed by Steve Bowen, Chairman & CEO of Maine Pointe.  Below Mr.

Bowen's signature is the phrase "Agreed:," followed by Mr. Jackson's signature, and the date of

October 1, 2015.  Attachment A, referenced in the employment letter above, includes the following

language:

> Attachment A to the Offer Letter of Howard Jackson dated September 28, 2015
>
> Your sales commission schedule shall be as follows:
>
> New Name Client Work Developed by you
>
> > Sales of $0 to $6,000,000          7%
> > Sales of $6,000,001 and above      8%
> …
>
> Management reserves the right to make changes to the sales commission plan as is
> deemed necessary by the business.

[Doc. 39-1 at 66].  Neither party disputes that Mr. Jackson negotiated his salary and commission

rates with Maine Pointe. [Doc. 49 at 4].

Mr. Jackson began his employment with Maine Pointe on October 15, 2015, at which point he received at least some training on Maine Pointe's customer development process [Doc 47-1; Doc. 51 ¶ 19].  Maine Pointe states that Bill Forster, Executive Vice President, Food & Beverage, and Collin Ziemerink, Executive Vice President of Business Development, reviewed the company's "Business Development Process PowerPoint with Plaintiff and explained how commissions are earned and paid at Maine Pointe." [Doc. 38 ¶ 19].  Maine Pointe attached a copy of this PowerPoint presentation and "Plaintiff's Onboarding Plan" to the affidavit of the Maine Pointe executive who states that he discussed with Mr. Jackson "how sales commissions were earned and paid at Maine Pointe" both before the employment letter was signed and when Mr. Jackson's employment began on October 15, 2015. [Docs. 42 ¶¶ 19-24, 42-1, 42-2].  Mr. Jackson does not dispute that he received a "small presentation of Maine Pointe's development process," but as it related to the payment of commission, he claims that it was only discussed "to the extent that Mr. Ziemerink told Plaintiff: 'Sell over $6 million worth of work in one year and you'll get 8 percent commission thereafter.'" [Doc. 51 at 6].

During his employment, Mr. Jackson identified Colony Brands as a potential customer for Maine Pointe, and requested that Mr. Forster authorize the conversion of the Colony Brands account into Mr. Jackson's name.  [Doc. 47 ¶ 12].  Mr. Jackson discovered that another Maine Pointe employee, Sara Raudenbush, could connect him with the proper contact at Colony Brands. [*Id*. at ¶ 13].  Mr. Jackson proposed that Ms. Raudenbush enter into a referral agreement, which would allow her to receive a 1.5% commission in exchange for her part in connecting Mr. Jackson with her Colony Brands contacts. [*Id*. at ¶¶ 14-22]  Mr. Jackson sent a solicitation email to Colony Brands on February 5, 2016, and left a voicemail for his Colony Brands contact on February 8, 2016. [*Id*. at ¶¶ 21-22].  On February 15, 2016, Mr. Forster informed Mr. Jackson that he was

terminated from his employment at Maine Pointe. [*Id.* at ¶ 23]. Following Mr. Jackson's termination, email correspondence between Mr. Jackson and Mr. Bowen indicates while Mr. Jackson was not to represent himself as an employee of Maine Pointe, he would be compensated with "a 10% commission solely" if he could deliver a "Level 1 fully developed opportunity" to Maine Pointe. [*Id.* at ¶ 25; Doc. 47-8].

In the days following Mr. Jackson's termination, a Maine Pointe Market Specialist, Don Rickling, re-sent Mr. Jackson's original solicitation email to the Colony Brands contact, Don Hughes. [*Id.* at ¶ 26]. Mr. Hughes responded to Mr. Rickling's email, referenced Mr. Jackson's name, and indicated that Colony Brands was interested in meeting with Maine Pointe. [*Id.* at ¶ 28]. Mr. Rickling scheduled the meeting between Colony Brands and Maine Pointe. Mr. Forster attended the meeting, and continued the sales development process with Colony Brands. [Doc. 38 ¶¶ 25-29]. Eventually, Maine Pointe secured a contract with Colony Brands which resulted in $6.3 million in collected engagement revenue. [Doc. 47 ¶ 54]. Maine Pointe paid Mr. Foster 7.5% commission in addition to his salary for his development of the Colony Brands deal, and Mr. Rickling received 1.5% for his involvement in soliciting and scheduling the initial meeting. [*Id.* at ¶ 59; Doc. 38 ¶ 31]. Ms. Raudenbush was paid a 1.5% referral bonus for providing the Colony Brands contacts to Mr. Jackson. [Doc. 47 ¶ 58]. Mr. Jackson was paid no commission from the Colony Brands revenue, and thus brought this action.

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be

drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800 (6th Cir. 2000). This Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could not return a verdict in favor of the non-moving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. *Id.* Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* A genuine issue for trial is not established

by evidence that is merely colorable, or by factual disputes that are irrelevant or unnecessary. *Id.* at 248-52.

## III.    ANALYSIS

Plaintiff's Amended Complaint, filed August 28, 2017, [Doc. 35], seeks relief on two claims.  First, that Maine Pointe breached its contractual obligation for the payment of commissions to Mr. Jackson. [*Id.*].  Second, if the Court finds an enforceable contract did not exist in this case, that Maine Pointe was unjustly enriched by Mr. Jackson's efforts, and Mr. Jackson is therefore entitled to the promised commission rate as an equitable remedy. [*Id.*].  Maine Pointe filed its motion for summary judgment following the submission of Mr. Jackson's Amended Complaint, claiming that it is entitled to summary judgment as to both counts therein.  [Doc. 37]. Mr. Jackson's motion for summary judgment, likewise, relates to both counts of the Amended Complaint. [Doc. 45].  Therefore, the parties' motions will be discussed together below.

### a.   Breach of Contract

The essential elements of a breach of contract claim in Tennessee include: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Johnson v. Prudential Ins. Co. of America, Inc.*, 939 F.Supp. 2d 845, 850 (M.D. Tenn. 2013) (quoting *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).[1]  To be enforceable, a contract must "represent mutual assent to its terms, be supported by sufficient consideration, be free from fraud and undue influence, be sufficiently definite, and must not be contrary to public policy." *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861, 865 (Tenn. Ct. App. 2002); *Johnson*

---

[1] Although Maine Pointe is located in Massachusetts, neither party has argued that Massachusetts substantive law should apply. Both parties argued the breach of contract and *quantum meruit* claims under Tennessee law.  Therefore, the Court will analyze this motion under Tennessee law.

*v. Central Nat'l Ins. Co. of Omaha, Neb.*, 356 S.W.2d 277, 281 (Tenn. 1962). Finally, it is well established that the determination of whether an enforceable contract has been formed is a question of law. *Grace v. Grace*, 2016 WL 6958887 at *3 (Tenn. Ct. App. Oct. 26, 2016); *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009).

### i. Existence of an Enforceable Contract

Mr. Jackson argues that "the undisputed facts certainly demonstrate that the parties intended to make an agreement and did, in fact, enter into a valid, enforceable agreement as evidenced by the Contract." [Doc. 46 at 4]. Maine Pointe disagrees, claiming that Mr. Jackson cannot establish the existence of an enforceable contract between the parties because the agreement lacks consideration. [Doc. 39 at 16]. Maine Point asserts that the promise in the contract to pay commission was entirely optional, and thus illusory. [2] In support of this contention, Maine Pointe references the phrase that appears both in the text of the employment letter and Attachment A, which laid out Mr. Jackson's commission schedule: "Management reserves the right to make changes to the sales commission plan as is deemed necessary by the business." [Doc. 39 at 18; Doc. 47-1] Maine Pointe argues that agreements "by employers to pay commissions, bonuses or

---

[2] Maine Pointe did not raise an illusory promise defense in its Answer to the Amended Complaint, [Doc. 36], and discusses this argument for the first time in its Motion for Summary Judgment, [Doc. 37]. To quote a court in the Middle District of Tennessee, "This Court is not impressed by [the party's] waiting until its reply brief on its motion for summary judgment to raise the illusory promise defense." *Armouth Int'l, Inc. v. Dollar General Corp.*, 2016 WL 3098058 at *1 n.1 (M.D. Tenn. June 3, 2016) That Court "reluctantly" allowed the party to assert the defense, however, when the opposing party "did not assert any prejudice in terms of discovery and it has full opportunity to brief the issue." *Id.* Maine Pointe argues that this affirmative defense is properly pled because, in its answer to plaintiff's Amended Complaint, it listed "Plaintiff's breach of contract claim failed because no enforceable contract pertaining to the payment of commissions exists," as its Fifth Defense, [Doc. 36 at 8]. Federal Rule of Civil Procedure 8(c)(1) requires that, "in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including … failure of consideration." Defendant's fifth defense fails to affirmatively state their illusory promise defense as required by Rule 8(c)(1). Mr. Jackson has asserted that he was prejudiced by Maine Pointe's inclusion of this defense, because plaintiff's counsel has already traveled to depose Maine Pointe's corporate deponent, and discovery is now closed. [Doc. 46 at 10]. However, because Mr. Jackson had the opportunity to fully respond to this defense in his own motion for summary judgment, this Court, as in *Armouth Int'l*, will reluctantly consider the merits of the illusory promise defense.

incentives to employees at the employer's discretion are illusory promises and thus unenforceable." [Doc. 39 at 17].

Tennessee law creates a rebuttable presumption that all contracts in writing signed by the party to be bound are "prima facie evidence of a consideration." *See* TENN. CODE ANN. § 47-50-103; *Cumberland Properties, LLC v. Ravenwood Club, Inc.*, 2011 WL 1303375 at *9-10 (Tenn. Ct. App. 2011) (stating that courts "generally endeavor to avoid finding that a promise was illusory and that there was thereby a failure of consideration."). The party asserting a lack of consideration for a validly executed contract bears the burden of overcoming the presumption of consideration. *In re Estate of Brown*, 402 S.W.3d 193, 200 (Tenn. 2013). In this case, the employment letter includes an offer of employment ("I am pleased to extend to you the opportunity to join Maine Pointe …. I look forward to your acceptance of this opportunity."), and the signatures of both parties. [Doc. 47-1 at 1-2]. It is undisputed that Mr. Jackson negotiated his commission rate with Maine Pointe. The letter clearly expresses the intention that Mr. Jackson will perform the duties of Vice President, Food and Beverage, in exchange for an annual base salary of $215,000 and eligibility for sales commission on collected engagement revenue. [Doc. 47-1]. Maine Pointe, however, argues that the reservation of the right to alter the commission structure is sufficient to rebut the presumption of proper consideration and render its promise to pay commission illusory.

A promise is illusory "when it fails to bind the promisor, who retains the option of not preforming." *German v. Ford*, 300 S.W.3d 692, 704 (Tenn. Ct. App. 2009). However, contractual obligations in which a party's discretion must be exercised "with reasonableness and good faith" are not illusory. *Id*. "In Tennessee, courts 'almost invariably' imply a requirement of good faith, 'requiring that the obligee's dissatisfaction with the obligor's performance exist in good faith and not be simulated to escape liability.'" *Armouth Int'l, Inc. v. Dollar General Corp.*, 2016 WL

3098058 at *1 (M.D. Tenn. June 3, 2016) (quoting *German*, 300 S.W.3d at 705); *Cumberland Properties, LLC*, 2011 WL 1303375 at *9 (finding that every contract imposes a duty of "good faith and fair dealing in the performance and interpretation of the contract.") (quoting *Elliot v. Elliot*, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004)).

In this case, there is no evidence to show that Maine Pointe was not acting in good faith when including the commission provision in Mr. Jackson's employment letter. It appears that the parties bargained until a mutually agreeable commission rate was determined and included in the employment agreement. From the figures at issue, it is clear that Mr. Jackson's primary source of earnings would come from commission on engagement revenue collected from business he developed. His salary, at $215,000 a year, is merely a percentage of the commission he could have earned at a 5-8% rate on multimillion dollar deals. It is clear that these incentives are the primary means by which employees like Mr. Jackson are compensated at Maine Pointe. Therefore, Maine Pointe could not be said to be acting "with reasonableness and good faith" if they failed to pay commission to employees who met their contractual obligation to develop new business for the company. The fact that Maine Pointe withholds the right to "make changes to the sales commission plan" does not negate its obligation to act in good faith, nor does it allow the company to escape liability for the payment of bargained-for commissions.[3]

---

[3] Maine Point argues that, because the employment contract with Mr. Jackson was terminable at will, "the implied covenant of good faith and fair dealing does not apply[.]" [Doc. 48 at 7]. Maine Pointe claims that *Schwartz v. Diagnostix Network Alliance, LLC*, 2014 WL 6453676 (Tenn. Ct. App. Nov. 17, 2014) supports this proposition. However, in *Schwartz*, a plaintiff claimed that he was terminated in bad faith pursuant to an at will employment contract when he worked to secure sales for commission, but was fired before payment on those commission payments were due. Mr. Jackson does not dispute Maine Pointe's authority to terminate him. Moreover, the court in *Schwartz* held for the defendant-employer when the contract explicitly provided that the plaintiff was not entitled to post-termination commissions or expenses. *See Schwartz*, 2014 WL 6453676 at *8 ("We recognize that Schwartz's termination after working to secure sales of Tem-PCR, but before any commissions from its sale became formally due, may be perceived as harsh. However, an unfortunate business outcome does not invalidate the parties' contractual structure.") Here, the agreement between the parties does not discuss post-termination commission, but only provides Mr. Jackson the opportunity to earn commission on new client work "developed by you." For these reasons, nothing in the *Schwartz* opinion persuades this Court that the implied duty of good faith that is so "invariably" applied by Tennessee courts is not applicable to this dispute.

Further, the language in the employment letter may allow Maine Pointe to reserve a right to make "changes" to the commission plan, but not to avoid payment entirely. Maine Pointe argues that "[a]greements by employers to pay commissions, bonuses or incentives to employees at the employer's discretion are illusory promises and thus unenforceable," and provides a slew of case law from various jurisdictions in support of this contention. The only cited case interpreting Tennessee law is *Stinger Industries, LLC v. Hill-Rom Co. Inc.*, 23 Fed. App'x 472 (6th Cir. 2001), which states that a promise "that does not put any limitation on the freedom of the alleged promissor but leaves his future action subject only to his own will is illusory." *Id*. at 474. The contract in *Stinger* allowed a manufacturer to decide not to sell products to a purchaser, and provided that the manufacturer would not incur any penalty if it decided to withhold its products. *Id*. at 475. In this case, management at Maine Pointe reserved the right to "make changes" to the sales commission plan, with the restriction that it was "deemed necessary by the business." It is clear, then, that this clause does not allow Maine Pointe to entirely withhold the payment of commissions to employees, but only to alter its payment plan.

The language of the employment agreement, presumption of good faith dealing, and Maine Pointe's history of paying bargained-for commission to its employees suggest that Main Pointe's promise was not illusory under Tennessee law. Therefore, Maine Point has not overcome the presumption of consideration present in this written contract. *See* Tenn. Code Ann. § 47-50-103. It is clear, then, that the parties mutually assented to an agreement supported by adequate consideration, and that the employment letter at issue is free of fraud, undue influence, and public policy concerns. Therefore, the employment agreement represented an enforceable contract between Mr. Jackson and Maine Pointe. Before considering whether Maine Pointe breached this

agreement, this Court must consider whether the terms of the agreement are sufficiently clear and unambiguous.

### ii. Ambiguity

Upon determining that the parties indeed entered into a valid contract, the Court must now seek to interpret the contract in such a way as to "give effect to the intent of the parties." *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 816 (Tenn. Ct. App. 2011) (quoting *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009)). To ascertain the parties' intent, courts will look to the plain meaning of the words in the document to interpret contractual language. *Id.*; *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). Courts will consider the language in the contract in the context of the entire agreement, "so as to avoid repugnancy between the several provisions of a single contract." *Wager v. Life Care Centers of Am., Inc.*, 2007 WL 4224723 at *10 (Tenn. Ct. App. Nov. 30, 2007) (quoting *Rainey v. Stansell*, 836 S.W.2d 117, 199 (Tenn. Ct. App. 1992)). When a contract is plain and unambiguous, courts will interpret the language used in its "plain, ordinary, and popular sense," and enforce the contract as written. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)); *Union Realty Co., Ltd. v. Family Dollar Stores of Tenn., Inc.*, 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007).

Occasionally, a contract provision "may be susceptible to more than one reasonable interpretation, rendering the terms of the contract ambiguous." *Crye-Leike, Inc.*, 415 S.W.3d at 816 (citing *Planters Gin. Co.*, 78 S.W.3d at 890). "Ambiguity, however, does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions." *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001) (citing *Cookeville Gynecology & Obstetrics, P.C. v. Se. Data Sys., Inc.*, 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994)). In determining

the meaning of a contract, its terms "are to be interpreted and their legal effect determined by consideration of the agreement as a whole." *Id.*; *Hill & Range Songs, Inc. v. Fred Rose Music, Inc.*, 570 F.2d 554, 556 (6th Cir. 1978). Further, the Court will not apply a "strained construction" of the contract language to create an ambiguity where none exists. *Maggart*, 259 S.W.3d at 704 (citing *Farmer-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

When a contract is ambiguous, however, the provisions at issue should be construed against the party responsible for drafting them. *Wager*, 2007 WL 4224723 at *11. "It is well-settled that parol evidence regarding 'the relations existing between the parties, the facts surrounding them at the time when they entered into the agreement, and also their acts subsequent thereto' may be considered by the court when interpreting an ambiguous contractual provision." *Dog House Investments, LLC v. Teal Properties, Inc.*, 448 S.W.3d 905, 913 (Tenn. Ct. App. 2014) (quoting *Faulkner v. Ramsey*, 158 S.W.2d 710, 711 (Tenn. 1942)). Therefore, if this Court finds that the contract between Maine Pointe and Mr. Jackson is ambiguous, it will consider evidence external to the four corners of the agreement in determining the intentions of the parties and interpreting the language of the employment agreement.

The clause at issue reads as follows: "You will be eligible to earn sales commission on collected engagement revenue (not analysis, nor reimbursed T&E revenue), based on the schedule in Attachment A." [Doc. 47-1]. Attachment A provides a sales commission schedule, in which Mr. Jackson is due 7% interest on sales of $0 to $6,000,000, and 8% on all sales $6,000,001 and above on all "New Name Client Work *Developed by you*." [Doc. 39-1] (emphasis added).

Maine Pointe defines the phrase "developed by you" as it is understood at the business: "At Maine Pointe, 'developed by you' means taking a potential customer through the sales development process to obtain an engagement agreement upon which engagement revenue is

collected by Maine Pointe." [Doc. 38 at 4]. Maine Pointe describes the company's sales development and commission payment process in detail, [Doc. 39 at 3-6]. Maine Pointe explains that the sales development process is split into two phases: phase one focuses on obtaining an analysis agreement from a prospective client, while phase two focuses on executing an engagement proposal from the client, from which engagement revenue is produced. [*Id*.]. Maine Pointe states that it pays sales commissions to employees only as engagement revenue is collected by the company, explaining that "[f]or each month engagement revenue is collected, Industry Leaders/Partners who earned a sales commission by taking the client through the sales development process and closing the sale, are paid a sales commission." [*Id*. at 6]. "While the term 'developed by you' was not expressly defined in Plaintiff's employment offer letter, Maine Pointe believes the term "as it is applied to a person in a sales position is pretty clear and means make a sale." [Doc. 48 at 9]. It is clear that Maine Pointe interprets the phrase "developed by you" as stated in the employment contract as an intention only to pay Mr. Jackson commission on engagement revenue on new business that he secured after developing the sale through both phases of the sales development process. [Doc. 48 at 9]. Maine Pointe, therefore, argues that the phrase "developed by you" is unambiguous, and clearly forecloses any claim Mr. Jackson asserts for commission.

Mr. Jackson also argues that the phrase "developed by you" is unambiguous. He states that his understanding of this contract term meant that he "would be paid a commission on the basis of providing new leads to the company and then developing those leads and bringing them to conclusion were I in a position to do so." [Doc. 51 at 5]. Mr. Jackson argues that his termination frustrated further efforts to advance the Colony Brands account, but that he is still owed

commission on the account because of his efforts in procuring a relationship with Colony Brands.

Mr. Jackson's affidavit states:

> During my employment, I was never told that I would not be compensated for locating new work that generated collected engagement revenue in excess of $6.3 Million. I was never told that "develop" has anything other than its plain and ordinary meaning. In my 30+ years in the sales and marketing industry, it has always been clear that salespersons and marketers who receive commission income for bringing in clients, unless otherwise *expressly* stated in their contracts, earn their pay once a client which they have brought into negotiation enters into a transaction. In some cases, they are there throughout to hold everyone's hands until the deal is done; in others, they are not. In my mind, it was clear that my base salary covered the hand-holding part, while I earned my commission by bringing the future client to the table. Nothing in my very long and extensive experience in this marketplace gave me any reason to believe such was not the case.

[Doc. 47-3 at 8-9]. Mr. Jackson avers that Maine Pointe "failed to disclose" their sales development and commission payment process, and that he had no knowledge that an "elaborate process had to take place before he would even be considered eligible to earn a commission." [Doc. 46 at 13]. It appears that Mr. Jackson believes that he is owed commission on revenue collected from clients that he brought to the table, and that the sales development process, or the "hand-holding part," was how he earned his base salary.

Thus, both parties claim that the phrase "developed by you" is unambiguous in their favor. The Court must determine the intent of the parties through an analysis of the plain meaning of the words used in the contract. Definitions of "develop" tend to describe a process of growing, advancing, or becoming. *See Develop*, Oxford English Dictionary, (3d ed. 2016) ("To grow or cause to grow, so as to become more advanced, elaborate, or mature; to acquire gradually or by successive stages."); *Develop*, Webster's Third New Int'l Dictionary, (3d ed. 1961) ("To cause to unfold gradually; conduct through a succession of states or changes each of which is preparatory for the next; to expand by a process of growth."). The use of "developed" in the past tense suggests all advancing, growing, or acquisition has already happened to its fullest extent. In

this case, developed new name client work must refer to accounts that have already advanced to their most mature stage.

The contract provides additional contextual information when it states that the plaintiff was due commission on "engagement revenue (not analysis, or reimbursed T&E revenue) based on the schedule in Attachment A." [Doc. 47-1]. These categories refer to the client development process, which assist in interpreting what the contract means when new client work is in fact developed. Taken together, then, it is clear that commission was due to Mr. Jackson only from collected revenue on new business that he developed through the successive stages of growth, resulting in an engagement agreement. Regardless of Mr. Jackson's knowledge of these terms prior to signing his employment agreement, the contractual language provided all the information necessary for him to glean the intended meaning.

The phrase "developed by you" is not ambiguous under a plain reading of the phrase within the context of the entire contract and attachment. Finding thus, this Court will not consider parol evidence as to the contract's formation, and will consider only what the parties have reduced to writing when determining whether the defendant has breached that contract by refusing to pay Mr. Jackson a commission on the Colony Brands account.

### iii. Breach of employment contract

The court must determine if, according to the undisputed material facts, Maine Pointe failed to perform its contractual duty. Whether Mr. Jackson is entitled to the payment of commission on the Colony Brands account boils down to the question of whether he "developed" the new name client work. If Mr. Jackson did develop the business, he is entitled to the 8% commission on the engagement revenue collected from Colony Brands, and Maine Pointe is in breach of the parties' agreement. If he did not develop the Colony Brands business, than he is not entitled to

commission, and cannot establish that Maine Point breached the employment contract by refusing to pay.

Maine Pointe argues that Mr. Jackson cannot establish a breach of contract. [Doc. 48 at 18]. First, Maine Pointe claims that Mr. Jackson is not due commission because he was "only eligible to earn commission for engagements he developed, and [Mr.] Jackson did not develop any engagement while employed by Maine Pointe." [*Id.* at 20]. Second, Maine Pointe argues that "because Mr. Jackson's employment letter did not provide for any continuation of salary, commissions, or benefits post termination," "any obligation to provide Jackson with such ended upon his termination." [Doc. 39 at 19]. Maine Pointe argues that because it was never obligated to perform the contractual duty to pay commission to Mr. Jackson, Maine Pointe has not breached the employment agreement between the parties. Mr. Jackson argues that he is entitled to the payment of commission on the Colony Brands account because he performed under his contractual obligation, which he states was to "procure new clients," while "servicing the clients above and beyond that was a separate part of his duties." [Doc. 46 at 6]. Mr. Jackson claims that Maine Pointe would never have known about the potential Colony Brands deal without his efforts, which were vital to the procurement of the new business. [*Id.*]

Mr. Jackson relies upon a number of cases for the proposition that under Tennessee law, employers cannot withhold earned commissions from employees, even at-will employees, who were terminated before the revenue was collected. *See Pacesetter Prop., Inc. v. Hardaway*, 635 S.W.2d 382, 387 (Tenn. Ct. App. 1981); *Winkler v. Fleetline Prods.*, 859 S.W.2d 340 (Tenn. Ct. App. 1993); *Westfall v. Brentwood Serv. Group, Inc.*, 2000 WL 1721659 (Tenn. Ct. App. Nov. 17, 2000); and *Reid v. Express Logistics, Inc.*, 2001 WL 1516980 (Tenn. Ct. App. Nov. 26, 2001). The plaintiff in *Winkler* was engaged to procure and service new clients for defendant-employer's

manufacturing business in exchange for a commission on all work performed for these new customers after defendant was paid. *Winkler*, 859 S.W.2d. at 341. The court found that "the procurement of the customer was the major purpose and servicing was a minor element" of plaintiff's responsibilities, and awarded him commission on the revenue generated from customers he procured for defendant's business. *Id*. at 342-43 ("In essence, plaintiff was a 'procurer.'"). Similarly, in *Westfall*, plaintiff's sole responsibility was to "sign-up" customers, and therefore his commission was earned at the execution of the contract between the new client and defendant-employer. *Westfall*, 2000 WL 1721659 at *1, 4 ("Westfall's sole employment responsibility was to procure customers for BSG."). *See also Pacesetter Prop., Inc. v. Hardaway*, 635 S.W.2d 382, 387 (Tenn. Ct. App. 1981) ("[T]he right of a broker to collect the commission is dependent upon whether the broker actually made the sale or was the procuring or introducing cause of the sale."). The court in *Reid* also found that the defendant-employer must continue to pay plaintiff commission on revenues that he brought in during his employment. *Reid*, 2001 WL 1516980 at *3.

Mr. Jackson relies on these cases and others for the proposition that, because he was the procuring cause of the Colony Brands account, he is due commission on the revenue collected by Maine Pointe. The cases on which Mr. Jackson rely, however, differ from this case in at least one material and determinative way. In *Westfall*, *Winkler*, and *Pacesetter*, the employee's obligation was clearly to *procure* new business for the employer. Mr. Jackson, however, was contractually tasked with *developing* new business for Maine Pointe. Mr. Jackson's understanding that his "base salary covered the hand-holding part, while [he] earned [his] commission by bringing the future client to the table," is not a reading that comports with the plain language of the contract. The contract clearly provides that Mr. Jackson was due commission on new client work that he

developed, not that he procured, solicited, recruited, or referred. Here, it is clear that Mr. Jackson was expected to develop the new name client work to the engagement phase, in which funds would be paid to Maine Pointe and commission distributed to those who brought about the procurement of the revenue. For this reason, the Court need not determine whether Mr. Jackson was the procuring cause of the Colony Brands sale, because his contractual obligation required that he develop the sale.

Mr. Jackson's reliance on *Reid* might be appropriate if he sought post-termination commission on work he had developed during his time at Maine Pointe. *See Reid*, 2001 WL 1516980 at *3 ("Mr. Reid contends that under Tennessee law, Express Logistics must continue to pay him commission on *sales he made* prior to his resignation. We agree with this assessment of Tennessee law.") (emphasis added). However, Mr. Jackson's efforts in arranging a contact between Maine Pointe and Colony Brands cannot meet the definition of "develop." During his employment with Maine Pointe, Mr. Jackson was able to locate the correct contact information for the relevant points of contact at Colony Brands, and sent an initial email. Because his employment was terminated, he was unable to advance the relationship with Colony Brands, or take them through the gradual, successive stages of eventually collecting engagement revenue from their mutually executed agreement. Developing new business certainly entails more than an initial attempt to bring a future client to the table for negotiations. Therefore, his efforts to make contact with Colony Brands cannot be said to rise to the level of having "developed" the new client business under a plain reading of the contract.

### iv. Breach of contract in post-termination email

In addition to the employment contract, Mr. Jackson also argues that he is entitled to 10% commission pursuant to a post-termination email exchange with Maine Pointe, in which Mr. Bowen states the following:

> Again, we are done, you are not part of Maine Pointe here forward, you are not to represent yourself in any fashion or association with Maine Pointe until you have brought to me personally a Level 1 fully qualified opportunity at which point it will be in our discretion as to whether or not we are interested to proceed. I hope you can do so and we will make it worth your while with a 10% commission, no expenses or day rate. We have the quality and capability to deliver, if you deliver a fully qualified Level 1 lead to me, Maine Pointe will strongly consider it.

[Doc. 47-8]. Mr. Jackson argues that he is "owed a 10% commission on this new business with Colony Brands" pursuant to this communication from Mr. Bowen. [Doc. 46 at 11]. Maine Pointe argues that this email does not constitute a contract for commissions between the parties because "it is clear there was no mutual assent between Maine Pointe and Plaintiff to pay Plaintiff a 10% commission on the Colony Brands engagement" because the contract does not refer to contacts he identified during his employment at Maine Pointe. [Doc. 48 at 15].[4]

From the text of the email, it is clear that Mr. Bowen is referring to a new "Level 1 fully qualified" opportunity that Mr. Jackson developed after his termination from Maine Pointe. Mr. Bowen is plainly offering the possibility of a 10% commission on future opportunities that Mr. Jackson may bring to Maine Pointe as an independent agent, not in relation to former client contact. Mr. Jackson does not present evidence that he delivered such an opportunity to Maine Pointe following his termination, nor does he develop any argument that the Colony Brands account qualifies as "new business," or a "Level 1 fully qualified opportunity." For these reasons, Mr.

---

[4] Mr. Jackson does not seek to establish that the post-termination email constituted a contract, not does he develop this argument in his motion for summary judgment beyond concluding that Maine Pointe "owes a debt" to Mr. Jackson. [Doc. 46 at 16]. In fact, in Mr. Jackson's reply brief, he states that he is "not making a new breach of contract claim," but rather included the information regarding the post-termination email "to determine what amount is owed to Mr. Jackson" should this Court determine that no enforceable contract exists. [Doc. 53 pages 13-14].

Jackson cannot establish that Maine Point failed to perform under any contractual duties created by this email exchange.

The material facts surrounding the creation and execution of the employment contract are not disputed. The only dispute of material fact relates to whether Mr. Jackson was fully aware of the sales development and commission payment processes at Maine Pointe, either before signing the contract or during his training as a new employee. However, finding the contract unambiguous, this Court will not consider such parol evidence, and interprets only the four corners of the contract in light of its plain meaning. Mr. Jackson's actions as an employee for Maine Pointe did not rise to the level of having "developed" new client work resulting in engagement revenue, and he is not entitled to commission under the contractual language. Therefore, Mr. Jackson cannot establish that Maine Pointe has failed to perform its contractual duties. Neither can he establish that he was due a 10% commission based on the post-termination email exchange between the parties. Maine Pointe has not breached any contract between the parties, and is not liable for the payment of commission to Mr. Jackson. For this reason, Maine Pointe's motion for summary judgment on Mr. Jackson's breach of contract claim, [Doc. 37], is **GRANTED**. Mr. Jackson's motion for summary judgment as to this count, [Doc. 45], is **DENIED**.

b. *Quantum Meruit*

Mr. Jackson argues that, if the Court finds that the parties did not enter into an enforceable contract for the payment of commission, then Jackson should be able to recover under a *quantum meruit* theory. In Tennessee, a claim for *quantum meruit* provides an "equitable substitute" for a contract where a party may recover a "reasonable value of goods and services provided" if certain circumstances are shown. *Doe v. HCA Health Svcs. of Tenn., Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001). In order to state a viable *quantum meruit* claim, the plaintiff must show (1) there is no

existing, enforceable contract between the parties regarding the same matter; (2) the party seeking recovery provided valuable goods and services; (3) the party to be charged received those goods or services; (4) the transaction circumstances indicate that the parties should have reasonably understood that the service provider expected to be compensated; and (5) the circumstances demonstrate it would be unjust for the receiver to retain the goods or services without payment. *Id.*

Jackson argues that Maine Pointe has been unjustly enriched by Jackson's early efforts in securing Maine Pointe's business relationship with Colony Brands. Jackson states that "[n]o one at Maine Pointe would have ever noticed the opportunity but for Howard Jackson's persistence," and that Jackson is "the only one who was vital to the Colony Brands deal." [Doc. 46 pg.18]. Maine Pointe argues that Mr. Jackson's *quantum meruit* claim cannot succeed because he was operating under an "enforceable at-will employment agreement," and can establish neither that Maine Pointe understood Mr. Jackson's expectation of commissions, nor that Maine Pointe was unjustly enriched by Mr. Jackson's services. [Doc. 39, pg. 24].

There is no need to discuss this alternative claim further, as the Court has already determined that the parties did indeed enter into an enforceable contract regarding the payment of commissions. For this reason, an equitable substitute for a contract remedy is neither necessary nor appropriate in the case where an enforceable contract is present. *Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998). Therefore, Maine Pointe's Motion for Summary Judgment, [Doc. 37], as to this count is **GRANTED**. Mr. Jackson's Motion for Summary Judgment, [Doc. 45], on the *quantum meruit* claim is **DENIED**.

## IV.    CONCLUSION

For the reasons discussed herein, Maine Pointe's Motion for Summary Judgment, [Doc. 37], is **GRANTED**.  Mr. Jackson's Motion for Summary Judgment, [Doc. 45], therefore, is **DENIED**, and his claims against Maine Pointe are **DISMISSED**.

So ordered.

ENTER:

_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE